May it please the Court, my name is Eric Citron. I represent Appellant Petro Star. The District Court's decision in this case is remarkably clear and candid about how it resolved the factual dispute between the parties and the legal rule it thought governed under the facts that it found. Following this Court's clear instructions on remand, the District Court built a factual record, and it found, as a matter of fact, that the extrinsic evidence just did not resolve the question of what the parties intended by the ambiguous term tariff. I had one sort of factual question. There's some dispute about who prepared the contract, if one of the parties prepared the contract in the sense used to create a presumption against the drafter. What evidence is there as to whether the defendant was the one that drafted the contract? Sure. The evidence on this point is totally unambiguous. Our witnesses testified. This is at ER 130 and 136. Mr. Lewis is asked pointedly who prepared the contract. He says BP prepared it. He's asked was there any negotiation over this term. He says no. And then BP's deponent, this is on ER 205 to 208, he describes exactly how the operative contract language was reached, and he's very clear about it. He's asked pointedly who actually wrote the contract. He says we wrote it with help from our legal counsel in Ohio. And then he also explains the process that BP used for formulating the language in the contract, and he says here's how it worked. We had this pretty restrictive computer program. You had to type in the terms that the parties had agreed to at a very high level, and then the computer program spat out the operative contract language as it was then refined by BP's legal counsel, who worked on it in Cleveland. Who chose the term tariff? I think the unadorned term tariff in context is chosen by BP. Is there any other word that could have been used for tariff? Isn't that the word that comes from the regulations or whatever it is the state commission applies? Well, actually, Petrostar's witness explains that many contracts don't just say tariff. They say the tariff in effect at the time, or they say the interim tariff. You could have clarified the issue. Is there a word other than tariff that could have been used? You mean a one-word substitution? Right. I mean, that's the term that's deemed ambiguous. But it seems to me it's the term that had to be used. The problem is that the contract didn't go on to clarify it in various ways. But according to the findings of the district court, neither party thought about that. And so it wasn't so much that it was drafted in a certain way. It's just a subject that was never negotiated and agreement was never reached. So there's just a void there. I understand the doctrine you're trying to apply, but I'm not sure the logic of it makes any sense in this situation. Well, I think it does make sense because the operative contract term is the price term as a whole. It doesn't have to be one word. It could have just been clarified with the words that this court offered in the previous opinion. It could say final tariff or it could say interim tariff. I think there's an extremely instructive piece of evidence in this regard. BP's witness testifies, this is around ER 38 to 42, that in BP's subsequent contracts, it clarified exactly this point when it was in its interest to do so. It said you won't get retroactive changes. Well, how could it know whether it's in its interest to do so because it doesn't know if the final tariff is going to be different. I mean, you act like that's a calculated decision. They're trying to leave it ambiguous here for some reason, and I don't see the logic of that. Well, in dealing with a party like Petrostar, the tariffs won't be revised upwards. The tariffs are revised downwards by the Consumer Protection Agency, whose whole purpose is to make sure that BP doesn't overcharge the parties who are shipping oil along the pipeline because of its role as carrier. So this is a protection that exists for BP's counterparties in these oil transactions. The protection needs to go their way. It's typically going to be in BP's interest to clarify that it's not going to provide a refund under those circumstances. Remember, BP's theory is that it gets the money, and it gets to keep it unless there's something about refunds. But it knew that there was a clearer way to write it. In subsequent contracts, it did write it more clearly. It just chose not to do so here. BP's other story is that... In any previous contracts, it would have been written differently. What did you say? I understand that subsequently they may have figured out there's a different way to do this. Do we have any evidence as to whether in previous contracts it was written differently? Well, the... Because that strikes me as more meaningful in terms of... I mean, you're trying to suggest this was a calculated decision by BP at the time. I have trouble seeing that. You're suggesting to me that in subsequent contracts they wrote it differently so they could have written it differently here. Well, fine, but if they hadn't thought of it by that point in time, the failure to write it differently here may not say very much. So did they write it differently earlier? I want to answer that question. I just want to... Take a while. Get into it. How about answering the question and then offering a qualification? Sure. I think there is a previous contract involving the state of Alaska that does have clearer language about whether there's going to be refunds or not. So clearer language is available. And BP's story is that they thought this was actually part and parcel of its being denominated the shipper under the contract. That was an easy point to clarify if they had wanted to clarify that as the shipper they could keep the refunds. Just don't clarify that in this contract at all. Now, the district court finds, as a matter of fact, that neither party contemplated this specific situation. We are not questioning that factual determination. This is the point I wanted to make. The doctrine doesn't actually depend on a determination that the other party pulled a fast one. That would actually be a core contract application, not contra preferentum. If the district court decided BP knew what was going on and it knew there was an ambiguity about who would keep the money and it knew Petrostar would think... I understand that distinction, but your argument seemed to be inviting the conclusion that this is a deliberate selection on the part of BP. I just don't see how that can be supported. Right, and the point I'd like to make is that's not a showing that I need to make to apply the canon. I'm sorry, finish your answer. The canon is simpler than that. It says when we have an intractable ambiguity, a true ambiguity, there is a term in the contract that governs. We don't know what it means. The tiebreaker we use is that we apply the canon against the party that selected the words just to incentivize it to be clear. It doesn't mean that that party was necessarily pulling a fast one. It just focuses the party's mind on this chance to clarify the contract when it takes up the pen and this issue is in its wheelhouse. I want to ask about a completely different issue. In the earlier appeal, there was a challenge to the district court's alternative holding that there was no showing of damages, and there isn't that argument on this appeal. What result flows from that? Does that mean you've abandoned the issue? Does that mean the issue is still alive and we just never got to it? What do we do with that alternative ground for the original decision? I think that if the district court's decision is defended by BP only on the grounds that it chooses in its brief, I actually was not aware that this issue might be in the case because the district court didn't reach it, and BP doesn't purport to defend the judgment on that ground. And so if BP is not defending the judgment below on that ground, then it's not an option. You're talking about on the burden of proof ground? No, there was a finding originally that there were no damages to support the contract claim. Yeah, the district court does not make that finding in the case on remand. BP does not purport to defend the judgment on that ground. It wasn't part of the remand, so I'm just a little bit puzzled procedurally how we deal with it because it was an issue in the previous iteration of the case. It got sent back on one issue and it came back on that issue, but I don't know what happened to the other one. My take on the way to apply the judgment mandate rule in a circumstance like this one is if the court had determined that that was an adequate ground on which to support the judgment below, it wouldn't have remanded. It remanded because the district court needed to determine the facts that are determined here. Then BP might have the option of defending the decision below by reanimating the ground, saying, well, this wasn't reached and this would be a good reason to find against Petrostar. But certainly if BP wants to defend the judgment on that ground in this appeal, it's got to say so in its brief so that we'd have some opportunity to say something about it. To be honest, I'm not even prepared to talk about it because it wasn't briefed, and that's why we have the rules that the parties have to choose the arguments that they want to defend the decision below on. Counsel, I want to go back to the contra preferentum issue. For me, this is the big deal. I practiced law for 37 years, primarily as a transaction lawyer, and a lot of my work was with oil and gas and big and little oil companies, so I'm very familiar with these kinds of contracts. And aside from the Western Petroleum Association, where people would occasionally do contracts on napkins in the old days, it was always set contracts, and the bigger the company, the more set the contract. In this case, let's assume, arguendo, that you are correct, that this was BP's form, that the terms, exact terms of how much, when delivered, quality, et cetera, were inserted with the help of the counsel. But let's say there's a true ambiguity. Nobody thought about tariff in this context. You've got some Ohio cases on the way contra preferentum is applied. One suggests the size of the companies makes a difference, so one suggests whether there was discussion, and so it makes a difference. What's your view of which line of Ohio cases we should follow? What's the best case, in other words, for your position on the application of that particular canon? Sure. I think the best case, I mean, I think there's a lot of cases that clearly suggest that when you're dealing with the canon in this sense, a true ambiguity, and you need a tiebreaker or you need a determinative legal rule, that you just look to which party drafted the case. You're not actually concerned. And which case do you think best? Well, so in recent cases, there's that statement in Cato against D'Amico, and there's also the statement in Panzeca. But the case I'd look to as the most instructive because of its holding is actually Coey, which is this case from 1921 about erecting electric poles on the plaintiff's land. This is a bilateral contract. It's not a form, and it is between a landowner, which is to say someone who is going to be making a bespoke agreement, and the electric company. And the court goes out of its way to say, look, neither party presented any evidence about what they meant by this term. And the way that we decide who should win in this circumstance is that we apply the doubt against the party that supplied the operative language that's ambiguous. There was the electric company, so the plaintiff won. And that's exactly, those are the facts of this case as BP describes them, and that's the operative legal rule that should decide it in our minds. And in that situation, at least under Ohio law, and I think certainly in the restatement, there's no, you don't have to ascribe scienter or anything against BP. Nobody's a bad person in this. This is simply, you know, big boys, smaller boys negotiating with oil. They have a set contract. Let's do this, let's do that. You've got a contract that's prepared. Nobody thought about this, and so we have to have a way to resolve it. Isn't that really what we're dealing with? That's exactly right. And if you look at the sources that we cite on page 32 of our opening brief, these are the contract treatises. They're saying exactly that. Look, you're going to get a situation sometimes where you just have a true ambiguity. You have a term that's the governing term. We're not talking about inserting a new one. We just can't determine what the parties meant by it for a situation like this one. And the way we resolve those true ambiguities is we just charge them against the party that picked the operative word because we're trying to create an incentive for that party to think about the possible lack of clarity and to supply terms that are clearer. Well, it's really just a tiebreaker in effect. Whether there's any policy issue behind it, I'm not sure. But the reality is, I mean, it was originally mainly applied against insurance companies. It was kind of a contract of adhesion. I don't think that's what's asserted here. I don't know the relative size of Petro. I certainly know that BP is a giant. I've dealt with them before myself in my practice. A huge, huge company, one of the biggest in the world, and they know how to do it. But the bottom line is this is a maxim that is used when people of goodwill just don't think about it. And they say, if you've drafted the contract, that's it. That's exactly right, and I'd like to reserve the balance of my time. I'll just emphasize one point along those lines. I mean, for what it's worth, the district court also finds, and this court said in the previous appeal, that BP was in a far superior bargaining position in this case. So even if that were an issue, the facts favor Petrostar on that regard. But I think you're right. For the tiebreaker purposes, that isn't actually material. Thank you, counsel. Good morning, and may it please the court. My name is James Spire. I represent BP Products of North America, Inc. Your Honor, the district court's factual findings and fundamental principles of contract interpretation require affirmance in this case. In this case, the district court conducted a bench trial. It made specific findings of fact, and it then held for BP. Petrostar does not challenge any of those factual findings. There is thus no dispute in this case that Petrostar is a large, sophisticated business with, quote, equally involved in the negotiations, and there's no dispute that Petrostar was able to, and in fact did, negotiate provisions of the contract to its benefit. Wait a minute. I don't remember anything from the district court that suggested that Petrostar and BP negotiated over the meaning of the term tariff. You're absolutely right, Judge Smith. There is nothing in the record that says that they negotiated over the meaning of the term tariff. Are you suggesting there's something that isn't in the record but is correct? No. I'm saying that throughout the long course of the negotiations, this was a contract heavily negotiated by the parties, and Petrostar had the ability to raise any sort of issue it wanted to. Well, I'm not sure how that helps us. Both parties had the opportunity to clarify something that neither of them thought about, And so the district court also found that neither party thought about this problem. There was no intention, one way or another, by anybody. So we're left with the bare words of the contract and the district court's finding that nobody thought about it, and therefore nobody had any intention about this issue. And I'm curious about your responses to the district court's findings on who prepared the contract, because I did read that somewhat differently than Mr. Citron. It seemed to me that the district court found that BP was the typist and fell short of really saying either way who drafted the contract. What is your reading of the district court on that point? My reading is, Your Honor, that BP was indeed the typist, but that the terms of the contract were negotiated jointly between the parties. Let me ask you something, counsel. You're an officer of the court, right? Yes, sir. Tell us the truth. So let's talk. Are you telling me that the contract that was presented was not originally presented by P2 Petrostar? That's exactly correct, Your Honor. Okay. So you gave them a contract. No, no, no. I am not saying that. Wait a minute. You gave them a document to look at, right? And then you started to negotiate what some of the specifics were about quantity, quality, time, and so on. Is that correct? No, Your Honor. Okay. What's correct? What's correct is that this was a two-part contract. One part was a bespoke contract that was negotiated between the parties. It was not a form contract. That was the first part that contained the price provisions and how you arrive at the price. Wait a minute. Let's be real here. The contract has a lot of general terms in it, right? How you're going to handle ambiguities, interpretation, attorney fee clause, and so on. You're saying that none of that was presented by BP? The whole thing was negotiated out of whole cloth? No, Your Honor. I'm saying if you look at the contract, there's two parts of it. There's part two, which is standard terms and conditions. Right. And that was presented by BP, right? That was presented by BP. Right. But then there's a type written, not pre-written. Of course. And where was tariff? Tariff was in part one, which was the negotiated part. Which was the standard part, right? No, it was not the standard part, Your Honor. There's two parts. Part one was the bespoke contract negotiated between the parties. Part two was the terms and conditions that contained all the other stuff you're talking about, but it did not contain the critical price term. So are you telling me that the part one, as you call it, the bespoke contract, the whole thing was negotiated between the parties? There was no part that was, if you will, standard boilerplate? The standard boilerplate was in part two. No, I know you got part two, but I'm talking about in part one. Are you telling me that no part of part one was a standard provision? That's right, Your Honor. I'll explain. Every word was negotiated. I'll explain to you why. Because there's only two refineries in Alaska that Petrostar owns, and it's a very unusual situation for BP to sell from the North Slope to an in-state refinery. So they had to fashion a unique contract for this circumstance, Your Honor. Okay, but you're still not answering my question. How many pages was this part one? How many pages did it contain? Five or six pages. Okay, relatively short. Maybe three. It's really short. Okay, and so your statement is that every aspect of this was negotiated ab initio between the parties. I'm saying that there were extensive negotiations between the parties with respect to part one of the contract. Whether every word was negotiated over, I don't think that's the case. Is there any evidence as to who put the word tariff in that document? Didn't it come from the attorney of BP in Ohio? I believe the word tariff did come from BP. You would expect that. So whether you talked about it or not, the fact is the word was put in there by BP. Again, I'm not ascribing Scientra. BP is a fine company, but the reality is you've got a situation here where on a comparative basis, Petrostar is like a wart on an elephant compared to the size of BP. It's a huge, huge company, and it understandably has to mechanize, has to standardize certain things. And what I'm struggling with here is how I deal with the fact that given the way a big, big company like that operates, the idea that somehow that you have these two co-equals sitting at the table and just negotiating everything. They needed some oil. It was convenient for you all to sell it for whatever reason. You sat down and did it. Your company gave them basically what they thought was the deal and maybe tweaked a little bit here, a little bit there. Isn't that what happened? That's not what happened, Your Honor. I have to respectfully disagree. What happened? What the findings of the district court were. I don't know what that. I want to know what happened. I mentioned what the findings are, so go ahead and speak to the findings. There were numerous concessions that Petrostar was able to gain through this contract negotiation. What were they? Concessions on price. They got a better price than they did through their prior contract with the state of Alaska. And their prior contract with the state of Alaska, by the way, contained an express provision concerning retroactive price changes. Okay. So Petrostar was well aware. That's the kind of thing you would expect. Price is always going to be negotiated. But it doesn't change the fact that you have these rather standardized provisions. And what I'm saying is it seems to me that what you have was a tariff was one of the terms that was put in there by BP. Didn't talk about it because nobody really thought about it. You're working on price, delivery, et cetera, et cetera. But that's what the negotiation took place about, right? But if the parties didn't talk about it, that's on Petrostar. Why? I'll tell you why, Your Honor. Because under the normal operation of law, BP as the shipper was entitled to receive the tariff refunds. Okay. So if Petrostar wanted to change that status quo and they were well aware that BP was the shipper and was entitled to receive the refunds. Tell me why under operation of law BP was entitled. I'd like to hear the rest of the answer. Okay. I'm following it. Go ahead. Because BP was entitled to receive the tariff refunds under the normal operation of law because BP was the shipper. Okay. Petrostar was well aware of that fact. Petrostar was also well aware that its prior contract with Alaska had an express provision addressing what would happen if there were retroactive price changes. Petrostar did not negotiate to put that type of provision into this contract. That's where I want to go next because in the 1992 Valdez contract, I think, I was on the prior panel, so I can say that we made a mistake about what the contracts actually said and didn't apply. Thank you, Your Honor. Well, we did. I mean, we made a factual mistake and the district court made a finding to that effect and did not feel free to take the next step with respect to that, but the court made a correct finding about that. So with respect to the 1992 Valdez contract and both of the 1999 contracts, it appears to me that we were just wrong the last time and that under the expressio unius maxim, BP wins as to those. So it seems to me that the only thing we're really arguing over here is the 1992 North Pole contract, I think. Is that right? Yes. Anyway, we're down to a very narrow place, it seems to me. And I guess one question I have is given that this is a windfall to either party, is this a case that belongs in our mediation unit? It's all about money and nobody actually earned it. So is that something that the parties are interested in? You don't have to. If you don't have authority to answer, you don't have to. Then I'll respectfully decline, Your Honor. Okay. Should we wait a couple of weeks after today to find out if the parties are interested in renewing discussions? I don't think that BP would have any objection to that, Your Honor. Let me explain why this case is not appropriate for the application of contra profferentum. And I want to particularly address your concerns, Judge Smith. What both parties agree is that contra profferentum applies only where the party's intent cannot be determined from consideration of extrinsic evidence. That's the foundation principle. Here, the court, in its capacity as fact finder, did not rule that the party's intent could not be determined. Instead, it expressly found that neither party had any intention to require BP to pay over its refunds. And a finding that neither party intended to impose an obligation is entirely different from a finding that the party's intent cannot be determined. Why is that? Well, because here you have an affirmative finding that neither party had an intent to impose the obligation. In a normal contra profferentum situation, there is no evidence whatsoever. There's no extrinsic evidence offered on intent. And the court says, well, there's no extrinsic evidence offered. We, therefore, cannot determine what the party's intent was. But here, you had a trial. You had express findings of fact. And you had the court determining that neither party had any intention. Okay, let's say that's true. Do you agree that there is case law that suggests that in that situation the canon does apply? Your Honor, Petrostar has been unable to cite a single case in Ohio or anywhere else where a court applied contra profferentum in the face of a factual finding that neither party had any intent to impose the obligation in question. Now, the second reason contra profferentum does not apply under Ohio law is that Ohio precedent is blindingly clear that it does not apply where both parties are sophisticated, where no form contract is involved, and where both parties had the ability to negotiate provisions of the contract to their benefit. What about Ponzica Construction Company versus Bridgeview Crossing? Blinding or not, that's an Ohio 2015 case, and it's just the opposite of what you just said. Your Honor, there are 14 cases, 14 appellate decisions construing Ohio law out of the Ohio Supreme Court, the Ohio Courts of Appeal, the Seventh Circuit, and the Sixth Circuit. Thirteen cases support the proposition I just stated. Ponzica is the only one that does not support that proposition, and Ponzica is not good authority, particularly compared to the 13 cases I've cited, and I'll tell you why. It's not good authority because, first of all, it's dicta. The Court did not apply contra profferentum in that situation, and the only authority Ponzica cited for the proposition that contra profferentum should apply in cases of equal bargaining power actually says the exact opposite. It says that contra profferentum applies where the written contract is standardized and between parties of unequal bargaining power. Are you asserting that British Petroleum and its subsidiaries are of equal bargaining position with Petrostar? You're not serious, are you? I am completely serious, Your Honor. What did you have for breakfast this morning? Your Honor, Your Honor, the way courts in Ohio determine whether there's equal bargaining power is not to measure the wealth and power of each party down to the last millimeter. What matters in terms of determining equal bargaining power in Ohio is whether the parties are sophisticated players and they have experience in the industry and whether they're able to negotiate provisions to their benefit. And I'll tell you a couple cases. Ohio courts have found equal bargaining power simply where both parties were sophisticated and had experience in the industry. That's the Dressler case at 2009 Westlaw 2457126. Ohio courts also find equal bargaining power between a corporation and an individual simply because that individual was a lawyer and was deemed to have understood the terms of the contract. That case is Girard. That's 2013 Westlaw 267296. Mr. Spire, your time has expired. Your Honor, I'm sorry. Oh, I'm sorry. I'm beyond. You're going the other direction, but you may wrap up in a sentence or two. Thank you, Your Honor. The Ohio courts of appeals are very clear that contraproferentum is reserved to work in favor of unsophisticated parties with unequal bargaining power who are bound to the terms of an adhesion contract. Out of the 14 appellate decisions that address whether a sophisticated party with the ability to negotiate can invoke contraproferentum, 13 go BP's way. Thank you, counsel. Mr. Citrin, you have some rebuttal time. I'll start by saying that I think it would be nice to have the parties sit down and see if they can't resolve this. When I picked up this case, I was a little bit surprised that it wasn't resolved already. Imagine our surprise. Yes, exactly. So that's something I think Petrostar would welcome. I'd like to address one point about a question that you asked my friend, and then if I have time, a point you made about whether we can reconsider issues from the previous appeal since I haven't had any opportunity to brief that. On the question of who was the drafter, I think it's extremely important to look at ER 35 and 36 where BP concedes at trial that it is not going to dispute the facts of what happened in the negotiation of the contract. So the question is, did you hear Petrostar's witness testify that BP drafted this contract? We're about to get testimony from BP about whether or not they have anything to say contrary to that. But the district court didn't make any findings about that. Well, I disagree with that. So the district court says, I think this is undisputed. BP stands up and says, that's right. We're not disputing the facts here about what happened. We're disputing the legal significance of it. And then what the district court said is, there is no dispute between the parties. This is in the opinion about the questions of historical fact surrounding this contract. What happened? And our witnesses testified unambiguously. This is at ER 130. Was there any negotiation over that price term? No. Were those all written by BP? Yes. There were some wording changes in other places in the contract. Was there any negotiation over those wording changes? No. And remember, the whole premise of the district court's decision is the parties didn't negotiate over this term. Right? That's why we're here. Well, that didn't mean they didn't negotiate generally, but they just didn't think of this problem. Well, they didn't think about this problem, and they didn't discuss this term. There was nothing to look to. What do you mean by this term? The pricing term. Okay. The term, the Sandler-Rosheff tariff differential. So it's not just the word tariff. It's the broader paragraph that talks about subtract this, subtract that. That's right. The way the pricing term was going to work. They negotiated what the marine transportation differential would be. They filled in that number, but they're not negotiating over how this works. I know, with the permission of our presiding judge, can I ask you this? Your learned colleague has commented about Ohio law and what's required to apply the kind in this case. In what way, if in any way, do you disagree with him on the construction of Ohio cases? Sure. If you look at those cases, it's not a true ambiguity situation. Usually one side is saying, I just win because this term is ambiguous. If it's not clearly in the other side's favor, they wrote it, so it's their fault. The Ohio courts do not apply that strict version of the rule unless there is an imbalance in bargaining power, which, again, the court found here. No, I don't read the court to find that with respect to this contract. I didn't see a finding that the parties didn't have an equal opportunity to bargain over this term. I mean, the district court's rationale for not applying the canon, it's not something BP defends here. It doesn't cite any Ohio law, but as I read the opinion, its rationale is BP was in a severely, Petrostar was in a severely compromised bargaining position. It needed oil. It was likely to agree to whatever BP wanted, so we're not going to apply the canon here. It then contradictorily points out that Petrostar was able to get some concessions, but it doesn't suggest why that matters. All I'm suggesting is this court said and the district court said that BP did have superior bargaining power. In any event, my point on Ohio law is when it's a true ambiguity, that's not the rule, and I think Judge Wood's opinion for the Seventh Circuit really helpfully points out that there are two strands in the doctrine, and we made this a big point in our opening brief, and BP didn't even attempt to distinguish between the cases in this regard. Thank you, counsel. I apologize. I just want to say something about the previous appeal. Quickly. There are six months between the North Pole contract and the Valdez contract. They're not at the exact same time. This court was right. The original contract didn't have this other provision about the quality bank from which you would draw the exclusio unius reference, and then the witnesses testified that they expected every subsequent contract to be the same as that original one. So this court did not get it wrong. This argument was presented in a petition for rehearing, and the court rejected it, and we obviously have had no opportunity to relitigate it, so it's law of the case. It's not something we can possibly change at this turn. Thank you, counsel. The case just argued is submitted, and we appreciate the helpful arguments from both of you.
judges: Graber, Clifton, M. Smith